Stacy L. OPAT, Appellee,

v.

Cheryl LUDEKING, Appellant.

Cheryl Ludeking, Plaintiff,

v.

Iowa District Court for Winneshiek County, Defendant.

No. 02–0657.

Supreme Court of Iowa.

July 16, 2003.

598

Richard D. Zahasky, Decorah, for appellant.

Dale L. Putnam, Decorah, for appellee.

TERNUS, Justice.

In this action for injunctive relief, the trial court found that the defendant, Cheryl Ludeking, has gone "out of her way to have contact with [the plaintiff, Stacy Opat,] to induce a state of anxiety," all in retaliation for Opat's high school rejection of Ludeking's friendship nearly twenty years ago. The court issued a permanent injunction restricting Ludeking's physical proximity to and interaction with Opat and members of her family. The court also held Ludeking in contempt for violating a prior temporary injunction issued by the court.

Ludeking appeals the court's order granting a permanent injunction and also challenges the court's contempt finding through a petition for writ of certiorari.

Based on our de novo review, we affirm the court's grant of injunctive relief. In addition, we think the court's contempt finding is supported by substantial evidence and so we annul the writ of certiorari.

I. *Background Facts.*

Because we concur in the trial court's factual findings after having undertaken a de novo review of the record, we borrow heavily from the trial court's order in setting forth the pertinent facts underlying the present appeal. In 1984–1985, Opat and Ludeking were friends for a few months during their freshman year in high school. Their friendship broke up, however, after Opat refused to write a nasty letter to a classmate with whom Ludeking had a dispute. Ludeking resented Opat's rejection and throughout the remainder of their time in high school harassed Opat, spreading rumors about her and calling her a bitch, slut, whore, and liar in the presence of others. Ludeking's actions caused Opat immense distress. Ludeking, in turn, derived great pleasure from her success in causing Opat emotional anguish.

In the fall of 1990, Ludeking persuaded another girl to follow Opat while Opat was shopping. Opat noticed that she was being followed and later that day saw the girl talking to Ludeking. Several months later Opat talked to the girl at a party and found out that Ludeking had asked the girl to follow Opat and report Opat's activities to Ludeking. When asked why, the girl explained that Ludeking hated Opat. In the same general time period, Ludeking or others acting at her request, rearranged letters on a sign at a business owned by Opat's parents to read "Stacy is a slut."

Ludeking, who has a bold and assertive personality, could see that she was having a detrimental effect on Opat, who is quiet

and reserved. Nonetheless, Ludeking continued to ridicule Opat when the opportunity presented itself.

Over the years Opat had sought help from her parents and school officials who told her she needed to toughen up and things would eventually get better. But by July 1991, Opat felt she had no way of stopping Ludeking. Opat required treatment for depression and attempted suicide by carbon monoxide poisoning.

Ludeking took advantage of this unfortunate occurrence to further torment Opat. About a month after Opat's suicide attempt Ludeking saw Opat on the street. In the presence of several other people, Ludeking yelled, "Did you hear Stacy Fjelstul [Opat's maiden name] tried to kill herself? Too bad she didn't succeed." Opat made no response.

Later in September 1991, Ludeking arranged for the delivery of a "gift" to Opat around the time of Opat's twenty-first birthday. One of Ludeking's cohorts put a package prepared by Ludeking under Opat's car, which was parked at Opat's place of employment. When Opat and a co-worker observed the package during a break, Opat asked her friend to open it. Although the package appeared to be a flower box with pretty wrapping on it, Opat was concerned Ludeking might be involved due to the odd method of delivery. Opat's friend was shocked upon opening the package. Ludeking's "gift" consisted of a Barbie doll with its head cut off, a razor blade stuck in its chest, and ketchup smeared around to represent blood. A note in the package said, "Try again."

Opat pursued criminal charges against Ludeking. While a charge of harassment was pending, Ludeking contacted a local priest to convey to Opat that Ludeking was seeking Opat's forgiveness. Ludeking did so in the hope that Opat would have the criminal charge dropped. Opat rejected Ludeking's request for forgiveness after she learned that Ludeking had not been forthright with the priest as to the acts for which Ludeking wanted to be forgiven. Later, Ludeking entered an *Alford* plea to a charge of aiding and abetting harassment.

In 1993, Ludeking and Opat sought the same secretarial position with the Winneshiek County office of the Natural Resources Conservation Service (NRCS). Opat got the job. In 1997 a similar position opened in the NRCS office in Allamakee County. Opat received a call from Ludeking, posing as "Pam Bolson," inquiring about the position. Opat was not able to answer all of "Pam's" questions and so Opat referred her to the Allamakee County office. "Pam" was persistent, however, in trying to get answers to her questions, to the point of being offensive. This contact by Ludeking was aimed at provoking Opat so Ludeking could report Opat's rudeness to Opat's supervisor. (In fact, Ludeking later called the Allamakee County office to complain that she had received rude treatment from Opat.)

Concerned that Ludeking was trying to interfere with Opat's employment, Opat called her supervisor in Des Moines. Although Opat had not previously informed her boss of her difficulties with Ludeking, she began to describe the situation to him. He interrupted her to ask if the other person involved was Cheryl Ludeking. Her supervisor was aware of Ludeking because Ludeking had applied for the Allamakee County position, but had not received an interview. Ludeking attributed her lack of success to Opat and had complained about Opat to Opat's supervisor and others in the Des Moines office. In reality, Opat had had no input in the decision whether to interview Ludeking.

In the summer of 2000, Opat and her husband decided to send their children to a parochial school associated with St. Benedict's Catholic Church in Decorah. After verifying that Ludeking and her family were not members, the Opats joined the parish. Within a few months, Ludeking and her husband joined St. Benedict's even though they had had no strong ties to the church previously. When the Opats saw the Ludekings at the 11:00 a.m. mass on several Sundays in a row, the Opats began to go to the 9:00 a.m. mass in order to avoid the Ludekings. After the Opats changed the service they attended, however, the Ludekings also began to attend the 9:00 a.m. mass.

In May 2001 Ludeking came to Opat's office under the pretext of asking for directions to the Department of Natural Resources (DNR) office in the same building. Opat gave Ludeking the directions Ludeking requested, but Opat was visibly upset by the encounter. Because Opat had seen Ludeking in the DNR office a week earlier, Opat doubted that a need for directions was Ludeking's true purpose in approaching Opat. Opat took Ludeking's actions as a threat. Shaken, she retreated to the break room for twenty minutes to wait for Ludeking to leave the building. When Opat returned to her desk, Ludeking was standing at the counter. Ludeking then walked through a swinging gate toward Opat's desk behind the counter, asking several questions about pictures of Opat's children that were on Opat's desk. Ludeking asked Opat to hand her the pictures, but Opat refused and returned to the break room. At this point, Opat was crying, shaking, and sobbing because she interpreted Ludeking's actions as a threat against her children.

Although Ludeking later claimed that she and her husband were conducting business in the NRCS office that day, the technician with whom the Ludekings worked refuted her testimony. He recalled waiting on another customer while Ludeking was in the office and testified that Ludeking did not ask for any service that day.

In addition to these specific events, Ludeking had the practice of following Opat around whenever they happened to be in the same store. This conduct occurred several times over the years.

Following Ludeking's visit to Opat's workplace, Opat again required mental health counseling. Her counselor, Charles Dopke, testified at trial that Opat was suffering from severe depression when he first saw her in May 2001. He explained her reaction to the office encounter with Ludeking as similar to a posttraumatic stress disorder arising from the doll incident years earlier. According to Dopke, Opat sees the beheaded doll incident as symbolic of Ludeking's intentions toward her. Opat views Ludeking as a clear threat and danger. When Ludeking asked to see the picture of Opat's children, Opat attributed the same intentions toward her children. Dopke testified that Opat's response to Ludeking's actions was not abnormal considering the traumatic event involving the beheaded doll.

At trial Ludeking denied any vendetta against Opat. Ludeking's response to Opat's testimony and that of Opat's witnesses was twofold: (1) Opat and the witnesses were lying; and (2) the contact between Opat and Ludeking that did occur was minimal and coincidental.

## II.  Issuance of Temporary Injunction.

On May 29, 2001, Opat filed the present action seeking temporary and permanent injunctions against Ludeking. Her attorney obtained an ex parte temporary injunction prohibiting Ludeking from coming within 500 feet of Opat or Opat's family

members. In obtaining this injunction, Opat's attorney failed to certify "either the efforts which [had] been made to give notice to the adverse party or that party's attorney or the reason supporting the claim that notice should not be required," as mandated by Iowa Rule of Civil Procedure 1.1507. Ludeking filed a motion to dissolve the temporary injunction, but this motion was not heard until the trial on Opat's petition in March 2002.

In the interim, Opat filed two applications for rule to show cause, claiming that Ludeking violated the restrictions of the temporary injunction on two occasions. In finding that Ludeking had violated the injunction on the first occasion, the trial court made the following findings of fact, which are supported by substantial evidence. (Since the court made no finding of contempt on the second application, we give it no further attention.)

On August 8, 2001, Opat encountered Ludeking when Opat took her children to Wal–Mart to have their pictures taken. Ludeking stood within several feet of Opat and her children for more than eight minutes while the children were photographed. Although Ludeking had also signed up to have her children's pictures taken, there was no reason for her to remain in the vicinity, as there was a long wait and the custom was for those waiting to shop until their names were called over the store's public address system. In fact, it was not until Opat's name had been publicly called that Ludeking came to the photography area to put her name on the list to have pictures taken.

### III. Trial and Judgment.

Opat's petition for an injunction and the two allegations of contempt were tried simultaneously to the court. After trial the court concluded Opat was entitled to permanent injunctive relief. An order was entered enjoining Ludeking (1) from coming within 100 feet of Opat's residence or place of employment, (2) from coming within twenty feet of Opat anywhere except St. Benedict's Catholic Church, and (3) from engaging in any conduct toward Opat or her family intended to provoke fear or anxiety in Opat. The temporary injunction was cancelled and the permanent injunction was ordered to remain in effect until April 1, 2012, unless extended for good cause.

As for the contempt charges, the district court found that Ludeking had willfully violated the temporary injunction at Wal–Mart. The court ruled that any procedural defect in the issuance of that injunction did not excuse Ludeking's violation. Nonetheless, the court withheld sentencing until such time, if ever, that Ludeking violated the permanent injunction. If no such violation occurred, ruled the court, Ludeking would be deemed to have purged herself of the contempt.

Ludeking was ordered to pay $300 towards Opat's attorney's fees, as well as the costs of the action.

### IV. Permanent Injunction.

■■■ A. *Principles governing our review.* Our review of the trial court's order issuing a permanent injunction is de novo. *Matlock v. Weets,* 531 N.W.2d 118, 121 (Iowa 1995). Although the trial court's factual findings are not binding, we give weight to the court's assessment of the credibility of the witnesses. *Id.*

■■■ An injunction is warranted when necessary to prevent irreparable injury and when the plaintiff has no adequate remedy at law. *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.,* 510 N.W.2d 153, 158 (Iowa 1993); *Myers v. Caple,* 258 N.W.2d 301, 304 (Iowa 1977). Thus, a party requesting injunctive relief

must establish "(1) an invasion or threatened invasion of a right, (2) substantial injury or damages will result unless an injunction is granted, and (3) no adequate legal remedy is available." *Skow v. Goforth,* 618 N.W.2d 275, 278 (Iowa 2000). In deciding whether an injunction should be issued, the court must weigh the relative hardships on the parties by the grant or denial of injunctive relief. *Myers,* 258 N.W.2d at 305.

A plaintiff has no adequate remedy at law when the threat of repeated misconduct would require a multiplicity of suits. *Hockenberg Equip. Co.,* 510 N.W.2d at 158; *Planned Parenthood of Mid–Iowa v. Maki,* 478 N.W.2d 637, 640 (Iowa 1991). The mere existence of criminal penalties does not preclude a party from obtaining injunctive relief. *Planned Parenthood of Mid–Iowa,* 478 N.W.2d at 640; *Hughes A. Bagley, Inc. v. Bagley,* 463 N.W.2d 423, 425 (Iowa Ct.App.1990).

B. *Evidentiary support for permanent injunction.* In carefully reviewing Ludeking's brief we find no argument that the facts *as found by the trial court* would not support the required elements for issuance of an injunction. Rather, Ludeking challenges the correctness of the court's factual findings, complaining in particular about the court's reliance on hearsay and opinion testimony. Of the various instances of such testimony discussed in Ludeking's brief, objection was made at trial to only two: (1) Opat's testimony that the girl who followed Opat in 1990 said Ludeking hated Opat; and (2) the testimony of Rita Fjelstul, Opat's mother, that she thought Ludeking asked the priest to intervene in order to get the criminal charges dismissed.[1] In addition to Ludeking's challenge to the admissibility of this evidence, Ludeking also discounts any testimony of

Opat that was not corroborated by another witness.

In our de novo review of the record, we have not considered the two items of evidence to which Ludeking objected at trial and now challenges on appeal. Nevertheless, based on the remaining evidence, we conclude Ludeking harbored great resentment toward Opat, if not outright hatred, a conclusion supported by the testimony of nearly every witness that testified. As for Ludeking's motivation in asking the priest's assistance in seeking Opat's forgiveness, we observe that the only time in the many years preceding this action that Ludeking expressed any remorse was when criminal charges were pending against her. But whether Ludeking contacted the priest in a last-ditch effort to avoid conviction on the harassment charge is really not as important as the fact that Ludeking orchestrated the entire Barbie doll incident. Although Ludeking denied any involvement, a woman who helped Ludeking put the package together testified to Ludeking's active participation. The trial court made a specific finding that this witness was more credible than Ludeking.

Upon our review of the record, we also think Ludeking's testimony on this point and in general did not have the ring of truth. Our view of Ludeking's credibility is supported by the assessment of Ludeking made by the trial judge, who had the opportunity to hear Ludeking testify and to observe her during the trial. The judge stated in his order:

> Cheryl [Ludeking] is aware that Stacy [Opat] perceives her as a threat. Although Cheryl's conduct does not appear obtrusive to uninformed bystanders, her acts are intentional subtle reminders to Stacy of Cheryl's attitude, if not intend-

---

1. The remaining challenges made on appeal to hearsay or opinion evidence were waived by Ludeking's failure to object at trial. *See In re C.T.,* 521 N.W.2d 754, 757 (Iowa 1994).

ed actions, toward her. Cheryl is aware that her contacts with subtle veiled threats re-traumatize Stacy. Sadly, Cheryl derives pleasure from Stacy's distress. *Her pleasure was apparent to the court during trial at times when Stacy was most upset.*

(Emphasis added.) Ludeking's claim that her contacts with Opat over the years were mere coincidences and not intended to cause harm ring hollow in view of the trial court's observations.

In summary, we have no reason to believe Ludeking's characterization of the past interaction between her and Opat. We also find no basis to ignore Opat's testimony, as Ludeking urges us to do. Much of Opat's testimony was supported by other witnesses at trial—witnesses who would have had little, if any, motivation to lie. Consequently, we make the same factual findings that the trial court did.

Although Ludeking does not claim on appeal that these facts would not warrant injunctive relief, we nonetheless conclude that any such claim would have no merit had it been made. Opat has proven the invasion of a right; she has established that substantial emotional injury will result unless an injunction is granted; and she has demonstrated that no adequate legal remedy is available. *See Matlock,* 531 N.W.2d at 123 (affirming injunction against plaintiff's former boyfriend based on the "negative psychological impact" of the defendant's actions on the plaintiff despite absence of "actual assault or verbal physical threat"). Ludeking's continued conduct toward Opat even after being convicted of aiding and abetting criminal harassment demonstrates that court intervention is warranted. We conclude injunctive relief was properly granted.

■ C. *Scope of injunction.* Ludeking also attacks the scope of the injunctive relief granted by the court. In particular,

she complains that enjoining her from any conduct toward Opat or Opat's family "intended to provoke fear or anxiety" in Opat is too uncertain and unclear. She relies on this court's pronouncement that the conduct enjoined " 'should be set forth with certainty and clearness so that persons bound by the decree may readily know what they must refrain from doing without speculation or conjecture.' " *205 Corp. v. Brandow,* 517 N.W.2d 548, 552 (Iowa 1994) (quoting 42 Am.Jur.2d *Injunctions* § 296, at 1095 (1969)).

We considered challenges to an injunction similar to the one at issue here in the *Matlock* case. There, the injunction imposed physical restrictions on the defendant's proximity to the plaintiff, her residence, and her place of employment. *Matlock,* 531 N.W.2d at 122. In addition, the defendant was enjoined from "taking any other action to harass the Petitioner." *Id.* The defendant claimed the injunction was vague and overbroad. *Id.* at 123. We concluded the language of the injunction was not vague and clearly conveyed to the defendant what he could not do. *Id.* We also held that it was "narrowly drawn to address the harm sought to be redressed." *Id.* We noted, "It prohibits only intentional acts by [the defendant] such as approaching, following, and harassing [the petitioner]. Also, it does not prevent [the defendant] from going about his daily business." *Id.*

We think the same can be said of the injunction issued here. The court's prohibition of "conduct towards [Opat] or members of her family intended to provoke fear or anxiety in [Opat]" is not "open to speculation or conjecture" as argued by Ludeking. As in *Matlock,* the injunction prohibits only intentional acts by Ludeking. Thus, while the injunction does not identify the specific activities subject to the injunction, only activities "intended to provoke

fear or anxiety" violate the court's order. When this aspect of the injunction is considered together with the restrictions on Ludeking's physical proximity to Opat, the message to Ludeking is clear: she is to stay away from any purposeful contact, direct or indirect, with Opat or her family. This ban does not unduly burden Ludeking, as she testified she wanted nothing to do with Opat. Therefore, we find no infirmity in the scope of the injunctive relief granted in this case.

## V. *Contempt.*

A. *Principles governing our review.* "Although there is no statutory right to appeal from a contempt order, the proceeding may, in a proper case, be reviewed by certiorari." *In re Inspection of Titan Tire,* 637 N.W.2d 135, 140 (Iowa 2001). "In a certiorari action, we may examine only the jurisdiction of the district court and the legality of its actions." *Christensen v. Iowa Dist. Ct.,* 578 N.W.2d 675, 678 (Iowa 1998). "Illegality exists when the court's factual findings lack substantial evidentiary support, or when the court has not properly applied the law." *Id.* Because certiorari is a law action, our review is for the correction of errors at law. *In re Inspection of Titan Tire,* 637 N.W.2d at 140.

B. *Validity of temporary injunction.* Ludeking first contends that the temporary injunction she was found to have violated was void from its inception because

Opat did not make the certification concerning notice required by rule 1.1507.[2] Ludeking argues she cannot be held in contempt for violating a void order. *See Burtch v. Zeuch,* 200 Iowa 49, 53, 202 N.W. 542, 543 (1925) ("There can be no contempt based on a process which is wholly void.").

"A void judgment is one that, from its inception, is a complete nullity and without legal effect." 46 Am.Jur.2d *Judgments* § 31, at 392 (1994). "A judgment is void when the court lacks jurisdiction of the parties or of the subject matter, lacks the inherent power to make or enter the particular order involved, or acts in a manner inconsistent with due process of law." *Id.* at 394, *accord Davis v. Rudolph,* 242 Iowa 589, 597, 45 N.W.2d 886, 890 (1951).

In contrast, a voidable judgment is not a nullity, but rather "has all the ordinary attributes and consequences of a valid judgment." 46 Am.Jur.2d *Judgments* § 30, at 392. Therefore a judgment that is merely voidable is enforceable until reversed or vacated. *Davis,* 242 Iowa at 595, 45 N.W.2d at 889–90; 46 Am.Jur.2d *Judgments* § 30, at 392. Procedural irregularities or errors of law render a judgment voidable, not void. *Holmes v. Polk City Sav. Bank,* 278 N.W.2d 32, 34 (Iowa 1979); *Davis,* 242 Iowa at 595, 45 N.W.2d at 889–90.

---

**2.** Iowa Rule of Civil Procedure 1.1507 provides:

Before granting a temporary injunction, the court may require reasonable notice of the time and place of hearing therefor to be given the party to be enjoined. *When the applicant is requesting that a temporary injunction be issued without notice, applicant's attorney must certify to the court in writing either the efforts which have been made to give notice to the adverse party or that party's attorney or the reason supporting*

*the claim that notice should not be required.* Such notice and hearing must be had for a temporary injunction or stay of agency action pursuant to Iowa Code section 17A.19(5), to stop the general or ordinary business of a corporation, or action of an agency of the state of Iowa, or the operations of a railway or of a municipal corporation, or the erection of a building or other work, or the board of supervisors of a county, or to restrain a nuisance.

Iowa R. Civ. P. 1.1507 (emphasis added).

Normally a judgment entered against a party without notice is void, as the court has no personal jurisdiction over the defendant. *E.g., Dimmitt v. Campbell*, 260 Iowa 884, 888, 151 N.W.2d 562, 565 (1967); *Davis*, 242 Iowa at 599, 45 N.W.2d at 892. In the case of a temporary injunction, however, the court may, under certain circumstances, enter a temporary order pending notice and hearing. *See* Iowa R. Civ. P. 1.1507; 42 Am.Jur.2d *Injunctions* § 243, at 826 (2000) ("Under certain conditions, temporary restraining orders and temporary injunctions may be issued without notice."); *id.* § 249, at 831 ("[A] temporary injunction issued by a competent court in the exercise of judicial discretion does not deprive a person of liberty or property without due process simply because it is issued ex parte."); *cf. Rouse v. Rouse*, 174 N.W.2d 660, 665 (Iowa 1970) (holding failure to give notice to adverse parties prior to appointment of a receiver did "not defeat the inherent discretionary authority of a court to act, absent notice, when reasonably satisfied such is necessary to prevent damage to or loss of property"). In Iowa, rule 1.1507 sets out the procedure to use when a party seeks a temporary injunction without notice to the adverse party. That procedure was not followed here, however, because Opat did not make the required certification.

This court has held that the issuance of a temporary injunction without the required notice is an irregularity that may be waived. *See Bowman v. City of Waverly*, 155 Iowa 745, 751, 128 N.W. 950, 952 (1910); *accord R & V, Ltd. v. Iowa Dep't of Commerce*, 470 N.W.2d 59, 62 (Iowa Ct.App.1991); 42 Am.Jur.2d *Injunctions* § 243, at 826 (stating "[t]he requirement of notice may be waived"). Even if the deficiency in the present case is viewed as a substantive failure to make the required factual showing to support the necessity of issuing a temporary injunction without no-

tice, that failure of proof simply renders the judgment erroneous and vulnerable to a motion to dissolve; it does not render the temporary injunction void. *See Davis*, 242 Iowa at 596, 45 N.W.2d at 890 (holding judgment "rendered without proof to sustain the allegations of the petition" was not void).

We conclude the temporary injunction issued here, even if not supported by the required certification, was at the most voidable, not void. Therefore, it was valid and binding until dissolved or vacated. Consequently, even though Ludeking believed the court's order imposing a temporary injunction was subject to challenge, she was obliged to obey it. *See Sound Storm Enters., Inc. v. Keefe*, 209 N.W.2d 560, 567–68 (Iowa 1973) ("[I]f merely erroneous, improvidently granted or irregularly obtained, the enjoined parties could still be punished for any attendant contemptuous behavior."); *Burtch*, 200 Iowa at 56, 202 N.W. at 544 ("It is elementary that disobedience of an order or process made by a court within its jurisdiction and power is a contempt, although the order or process may be irregular or irregularly issued."). Thus, any procedural irregularity in the proceedings leading to the temporary injunction is not a defense to a charge of contempt.

C. *Evidence of willful violation.* "In order to find a person guilty of contempt, a court must find beyond a reasonable doubt that the individual willfully violated a court order or decree." *In re Marriage of Jacobo*, 526 N.W.2d 859, 866 (Iowa 1995). Ludeking claims the evidence in this case will not support a finding of willfulness.

Willfulness is established by proof of "intentional and deliberate" conduct undertaken with a bad purpose, in disregard for the rights of another, or contrary to a

known duty. *Id.* We are convinced there is substantial evidence to support the trial court's finding of willfulness.

The credible testimony in the record shows Ludeking, being well aware of the prohibitions of the temporary injunction, knowingly stood within several feet of Opat and her children for at least eight minutes. Even if Ludeking's initial encounter with Opat at Wal–Mart was coincidental, the sustained nature of the contact was intentional and deliberate. Thus, we think there is substantial evidence that Ludeking deliberately acted contrary to a known duty. Consequently, the trial court did not err in concluding Ludeking willfully disobeyed the court's temporary injunction order.

### VI. *Summary.*

Upon our de novo review, we conclude the plaintiff has established the prerequisites for issuance of a permanent injunction. We also find no infirmity in the terms, scope or duration of the injunction crafted by the court. Accordingly, we affirm the court's order enjoining Ludeking's contact with Opat in the particulars set forth in the trial court's judgment.

Any irregularity in the proceedings leading to issuance of the temporary injunction does not excuse Ludeking's violation of the court's order. Moreover, there is abundant evidence that Ludeking's prohibited contact with Opat on August 8, 2001, was willful. Finding no illegality in the court's judgment of contempt, we annul the writ.

**AFFIRMED ON APPEAL; WRIT ANNULLED.**