# IN THE COURT OF APPEALS OF IOWA

No. 21-1492
Filed May 11, 2022

IN RE THE MARRIAGE OF SARA LYNN CICKAVAGE
AND JESSE QUANAH CICKAVAGE

Upon the Petition of
SARA LYNN CICKAVAGE, n/k/a SARA LYNN JARVIS,
    Petitioner-Appellee,

And Concerning
JESSE QUANAH CICKAVAGE,
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Butler County, Christopher C. Foy,

Judge.

A father appeals from a writ of injunction, modification of visitation, and

denial of a modification of physical care. **AFFIRMED AND REMANDED WITH**

**INSTRUCTION.**

Jesse Q. Cickavage, New Hartford, self-represented appellant.

John J. Wood of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C.,

Waterloo, for appellee.

Considered by Greer, P.J., Ahlers, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**GREER, Presiding Judge.**

In this appeal, Jesse Cickavage contests the district court's modification of the dissolution decree and the permanent injunction issued against him. To lay out the background, Sara Jarvis (formerly known as Sara Cickavage) and Jesse were married in 2014. They lived in Sara's hometown, Fargo, North Dakota, and together had two children born in 2011 and 2015. After Jesse accepted a job in 2016, the family moved to Iowa where their third child was born in 2017.

As the relationship crumbled, Sara petitioned to dissolve the marriage in 2019. During the dissolution proceedings, Sara was granted a protective order against Jesse under Iowa Code chapter 236 (2019) after he assaulted her during two separate arguments in early 2019. Sara considered moving back home to North Dakota, but she decided to remain in Iowa to attempt to peacefully co-parent. The two dissolved their marriage by stipulated agreement that August, which the court confirmed. The agreement gave Sara physical care, gave Jesse and Sara joint legal custody, established a visitation schedule for Jesse, and directed Jesse to pay child support. As Sara had an established problem with alcohol, the agreement stated Sara would not consume alcohol while the children were in her care.

Within a couple of months, Jesse sought to hold Sara in contempt of the dissolution decree for a variety of complaints pertaining to personal property, real property, and medical expenses. The court ordered mediation; as a result, in exchange for Jesse dropping the contempt order, Sara lifted the protective order.

As time went on, Sara wanted to move back home to North Dakota where she felt she had a stronger support system. She approached Jesse with the idea;

by her account, he responded that she could move with the children if she agreed to a joint physical care arrangement—at least on paper—so he no longer had to pay child support. As this was not a tenable financial option for Sara, she petitioned for modification of the custody agreement in July 2020. Her proposed modification plan would give Jesse about the same amount of overnight visits as he was previously guaranteed.

Within weeks of Sara's modification filing, plans came to a screeching halt. While intoxicated, Sara backed her car into a light pole; her middle child was in the vehicle with her and the other two children were left home unsupervised. She was arrested and charged with operating while intoxicated (OWI) and three counts of child endangerment. The Iowa Department of Human Services (DHS) opened a child-abuse investigation and established a safety plan. Upon the department's recommendation, Sara placed the children with Jesse until it was determined safe to return them to her care.

Jesse filed an application for emergency relief seeking to gain physical care of the children. He also sought the suspension of his child-support payments as well as appropriate payments from Sara. At the hearing, Sara acknowledged that she had an alcohol problem. Upon her release from jail, Sara completed a substance-abuse evaluation, which recommended outpatient treatment. She started treatment and met weekly with a counselor, and she saw a psychiatrist to adjust her mental-health medications.

Ultimately, the court determined DHS had appropriately managed the situation and ensured the immediate safety of the children, which made a formal change to the children's physical care unnecessary and against their best

interests. And, within ninety days of being placed with Jesse, DHS determined the children could be returned to Sara. She had maintained her sobriety and, despite completing her treatment, she voluntarily remained in counseling.

The day before the court denied Jesse's petition for emergency relief, Jesse filed an answer and counterclaim to Sara's modification petition. The counterclaim, similar to the application for emergency relief filed two weeks earlier, focused on seeking a modification of the physical care arrangement. More than a month later, Jesse applied for an entry of default judgment, asserting his counterclaim had gone unanswered. Sara responded, stating Jesse had "engaged in a practice of filing frivolous and inflammatory pleadings with the Court which appear to be designed, in part, to cause [Sara] to incur significant attorney fees . . . ." She also, however, responded to the counterclaim, stating she was complying with DHS and remained sober. The court explained that if Sara ever was in default, she had responded and so the pending default application should be denied. Jesse applied for an interlocutory appeal, which our supreme court denied.

The communication between Sara and Jesse continued to deteriorate, though; so in January 2021, Sara petitioned for a temporary injunction. The court granted the petition, which prevented Jesse from "[t]hreatening, assaulting, stalking, attacking, harassing, or otherwise contacting [Sara] in any manner either directly or through third-persons anywhere within the State of Iowa" or "[c]ommunicating with or contacting [Sara] in person, in writing, or through third-persons." The injunction did not affect Jesse's visitation and allowed for limited communication pertaining to the children.

Pursuant to Iowa Rule of Civil Procedure 1.1509 (2021), Jesse moved to dissolve the temporary injunction and the court held a hearing to determine whether to dissolve, vacate, or modify it. Sara testified at the hearing that Jesse repeatedly threatened to file contempt actions against her, sent people to watch her home when he thought she had taken the children out of state, and showed up at her door to "serve" her papers while videotaping her. At a doctor appointment for one of the children, when COVID-19 restrictions allowed for only one parent in the examination room, Jesse made a scene that led to the receptionist calling the police. Overall, Sara maintained that even seeing a text message from Jesse on her phone caused her great stress and anxiety. In the week that the temporary injunction had been in place, she testified, she felt far calmer.

At the temporary injunction hearing, Jesse, appearing pro se, began questioning Sara, asking if messages she had sent him "were legitimate" and arguing her messages did not reflect fear of him. She explained, though, that he was controlling and overbearing. Outside of his questioning of Sara, Jesse did not testify and offered no exhibits as evidence.[1] Instead, he called one of the children's daycare providers to give context to a recent dispute between the parties.

The same day he filed his motion to dissolve the injunction, Jesse also moved for sanctions against Sara's attorney under Iowa Rule of Civil Procedure 1.413(1). Jesse argued that though rule 1.413(1) states "Counsel's

_____

[1] Jesse did attempt to offer over 200 pages of text messages into evidence. Sara objected, explaining she had not had sufficient time to look the messages over as Jesse had uploaded them to EDMS shortly before the hearing. The court explained Jesse would have to lay proper foundation and then offer the exhibits as he went. Jesse referenced the messages, but he never entered them into evidence.

signature . . . shall be deemed a certificate that . . . to the best of counsel's knowledge, information, and belief, *formed after reasonable inquiry*, it is well grounded in fact," Sara's counsel had allowed "false, misleading, and fraudulent claims that are unsubstantiated" to permeate the application. (Emphasis added).

After hearing the evidence, the court confirmed the temporary injunction and denied the motion for sanctions. Discussing the injunction, the court described Jesse's behavior as

> a pattern and practice . . . to belittle and annoy Sara for no good reason. . . . [F]rom the record it appears that much of the conduct of Jesse is motivated by malice and the primary purpose of a good part of the communication directed to Sara by Jesse is to attack her worth as a person and as a parent.

The court found no "legitimate purpose" for Jesse's conduct that emotionally and psychologically harmed Sara. As to the sanctions, the court found "nothing in the case file or the record made at hearing [supported] the imposition of sanctions under Rule 1.413(1) or finding [counsel had] engaged in unethical conduct in his representation of Sara in this case."

After the hearing on the temporary injunction, Sara applied for a permanent injunction. The actions for the petition for modification and for permanent injunction were consolidated for trial.

In April, the court heard the consolidated cases. Sara again explained she wanted to move to North Dakota where she had a better support system. She also confirmed she had remained sober for the eight months since her arrest. Sara described the time since the temporary injunction, saying it had significantly limited her anxiety; and, while Jesse could email her about the needs of the kids, he had not sent her a single message since the injunction's entry.

To support her move, Sara testified about the reasons for the change in visitation and what the children's lives would look like in North Dakota. She arranged for in-network health-care providers, a school, and counseling and therapy services comparable to what the children had in Iowa. Addressing her struggles in Iowa, Sara discussed her belief she would be a better, healthier mother with her family and support system close by. She acknowledged, though, that she wanted to maintain the relationship between the children and Jesse.

When it came time for Jesse to testify on direct examination, because he was pro se, he was allowed to bring his laptop to the stand to access an outline of points he wanted to address. But, Sara objected to the reading of the notes to refresh his memory of the facts. The district court agreed, allowing Jesse to use the notes to "stay on track," but not as a way to retrieve information he could not remember off the top of his head. Still Jesse detailed his parenting strengths, his stability, and his concerns about Sara's alcoholism. He offered several exhibits and called many witnesses.

After the case was submitted and three days before the final orders were filed, Jesse moved to reopen the record. To his motion, he attached evidence alleging Sara had already enrolled the children in school in North Dakota.

In two orders, the district court extended the injunction for two years, declined to modify physical care, and modified the visitation arrangement to allow Sara to move to North Dakota. In the modification order, it also denied Jesse's motion to reopen the record, finding the issue would only serve to prolong the modification issue unnecessarily in light of the district court's decision.

**Discussion.**

Jesse proffers twenty arguments, which relate to (1) the injunction, (2) the modification of the decree, and (3) trial concerns. We address each in turn below.[2]

**A. The Injunction.**

Jesse laments the injunction interferes with his ability to communicate about his children, is not necessary, and effectively violates his rights. In some circumstances, there is a place for a permanent injunction between parents. A permanent injunction is appropriate when "[a] plaintiff [can] establish '(1) an invasion or threatened invasion of a right; (2) that substantial injury or damages will result unless the request for an injunction is granted; and (3) that there is no adequate legal remedy available.'" *In re Langholz*, 887 N.W.2d 770, 779 (Iowa 2016). "In deciding whether an injunction should be issued, the court must weigh the relative hardships on the parties by the grant or denial of injunctive relief." *Opat v. Ludeking*, 666 N.W.2d 597, 604 (Iowa 2003). "A plaintiff has no adequate remedy at law when the threat of repeated misconduct would require a multiplicity of suits." *Id.* An injunction is not meant to punish, but instead to prevent harm; it should "afford[] relief to the complainant but . . . not interfere with the legitimate and proper actions of the person against whom it is granted." *Langholz*, 887 N.W.2d at 779–80. The injunction should be "drawn narrowly enough to address

---

[2] While we consider all issues Jesse raises on appeal, there are a number of claims that are unpreserved or not supported by legal authority. As such, we do not address them. *See* Iowa R. App. P. 6.903(3)(g)(3); *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."); *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 695 (Iowa 2013) ("It is well-settled that a party fails to preserve error on new arguments or theories raised for the first time in a posttrial motion.").

the harm sought to be redressed." *Matlock v. Weets*, 531 N.W.2d 118, 123 (Iowa 1995). We review the issuance of a permanent injunction de novo. *Opat*, 666 N.W.2d at 603.

Jesse first argues that his communications with Sara had a legitimate purpose apart from simply intimidating or harassing her; he claims he has a constitutional right and duty to communicate with her about their children. Jesse therefore believes the injunction granted by the district court violates his rights, under both the Iowa and United States Constitutions, to free speech.

But, the terms of this injunction do not prohibit Jesse from communicating with Sara about their children. Instead, it merely limits the methods he can use while preventing him from "[t]hreatening, assaulting, stalking, attacking, harassing, or otherwise contacting" her. These restrictions do not "prevent [him] from going about his daily business," *Matlock*, 531 N.W.2d at 123, or "interfere with [his] legitimate and proper actions." *Langholz*, 887 N.W.2d at 780.

In support of his assertion that this limitation violates his right to free speech, Jesse provides case law only about the fighting-words doctrine.[3] While Jesse's messages may not be fighting words, this doctrine is but a twig in the larger tree of free-speech jurisprudence. He failed to convince us his communications with Sara are protected speech, or that the limitations placed on him violate his constitutional rights in any way. *See Emma Goldman Clinic v. Holman*, No. 05-

---

[3] "'Fighting words' are those personally abusive epithets which by their very utterance inflict injury or tend to incite an immediate breach of the peace,'" and "[s]tates are free to prohibit the use of 'fighting words.'" *State v. Fratzke*, 446 N.W.2d 781, 784 (Iowa 1989) (quoting *Chaplinksky v. New Hampshire*, 315 U.S. 568, 572 (1942)).

0297, 2006 WL 3436221, at *4 (Iowa Ct. App. Nov. 30, 2006) ("[N]ot every limitation on speech violates the Constitution."). We will not make these arguments for him, so we address the issue no further. *See Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 643 n.2 (Iowa 2019) ("It is not our role to rewrite a pro se pleading, nor can we act as the advocate for a pro se litigant.").

Third, Jesse argues that Sara was not entitled to an injunction because she had another remedy available to her—to press charges for harassment. This, however, is not a remedy that would prevent future action; it would merely criminalize past behavior. Because that would not be an adequate remedy, an injunction is appropriate. *See Opat*, 666 N.W.2d at 604 ("The mere existence of criminal penalties does not preclude a party from obtaining injunctive relief."); *Hughes A. Bagley, Inc. v. Bagley*, 463 N.W.2d 423, 425 (Iowa Ct. App. 1990) ("Plaintiffs are not precluded from seeking the issuance of a permanent injunction merely because criminal penalties exist which are designed to deter unlawful acts.").

Finally, Jesse asserts that the injunction causes more damage to him and offers no protection to Sara because the emails he sends her still go to her phone like a text message or phone call. The intent of the injunction was to limit abusive contact and reduce the communication to messaging only about the children and their needs. Likewise, the court heard Sara testify the impact of the temporary injunction "was like a sigh of relief." As the district court said:

> Jesse . . . engaged in an ongoing course of harassing, intimidating, and demeaning conduct directed against Sara. . . . [I]t is difficult for the Court to imagine any reasonable person being able to tolerate or withstand the constant and ongoing pressure and demands put forth

by Jesse without suffering depression, anxiety, or some other mental illness.

Regardless of Jesse's evaluation, we believe the injunction is appropriate and limited in scope to provide Sara relief from the hardships he imposed.

For these reasons, we uphold the court's imposition of a permanent injunction.

### B. The Modification.

Ahead of her move to North Dakota, Sara requested approval of a new visitation schedule for Jesse and confirmation from the court that her move would be in the children's best interests. To respond, Jesse called for a change in physical care to him. In the end, the district court condoned the move and changed the visitation schedule so Jesse would have optimum time with the children given the distance. Not surprisingly, Jesse challenges the district court's modification of the visitation schedule and its failure to change the custody agreement. Our review is de novo. *In re Marriage of Thielges*, 623 N.W.2d 232, 235 (Iowa 2000).

A party seeking to change physical care must prove, by a preponderance of the evidence, both (1) a substantial change of circumstances justifying the change, and (2) they can more effectively attend to the children's well-being. *Id*. The burden is high because "once custody of children has been fixed it should be disturbed only for the most cogent reasons." *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). In seeking a change of physical care, "[t]he changed circumstances affecting the welfare of children and justifying modification of a decree 'must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.'" *In re Marriage*

*of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). But, to change visitation, the courts require "much less extensive change in circumstances." *In re Marriage of Salmon*, 519 N.W.2d 94, 95–96 (Iowa Ct. App. 1994). Instead, the party requesting the change "must establish by a preponderance of evidence that there has been a material change in circumstances since the decree and that the requested change in visitation is in the best interests of the children." *Id.* (citation omitted).

On the physical-care question, Jesse disputes the court's denial of his request for change, arguing that Sara's alcohol problem was a sufficient, permanent change in circumstances warranting a change in physical care. To make his case about the permanency of Sara's alcoholism, Jesse offered video evidence of Sara's intoxication that preceded the parties' decree establishing physical care in Sara. He argued Sara's recent OWI arrest represents an "escalation of [Sara's] abuse of alcohol." *See In re Marriage of O'Brien*, No. 17-0828, 2018 WL 739329, at * 2 (Iowa Ct. App. Feb. 7, 2018). As support for a change in physical care, Jesse points to *O'Brien*, as lending credence to his contention that "escalated alcohol abuse" can be a substantial change in circumstances. *See id.* But, *O'Brien* consisted of a parent who had an unmanaged alcohol addiction and, at the time of the modification hearing, admitted she was still drinking. *See id.* at *1. This is a stark contrast to Sara who not only successfully completed treatment soon after DHS became involved, but remained sober between the August 2, 2020 arrest and the modification hearing in April 2021. While Sara's alcoholism may be permanent, her alcohol abuse is not— Jesse was able to provide no evidence that Sara continued to imbibe alcohol at the time of the modification hearing. Sara, on the other hand, provided statements

from her substance-abuse counselor and DHS service providers[4] that she has shown no signs of alcohol use and is benefiting from continued counseling. Unlike *O'Brien*, where the mother had no demonstrated ability to curtail her alcohol abuse, Sara has shown a determination not to allow alcohol to be a persistent problem. *See id.* Her August 2 arrest is not a permanent change in circumstances requiring a modification of the physical care agreement. As Jesse did not meet the burden to show a permanent change in circumstances, we need not move forward to consider his argument that he is better able to minister to the needs of their children.[5]

On the change-in-visitation issue, Jesse argues the district court was wrong to alter the visitation agreement because Sara had considered moving before the dissolution stipulation was filed. But, while Sara had thought about moving, she had disavowed the idea in the hopes of peaceful co-parenting and agreed to the visitation schedule with the intention to stay in Iowa; no part of the stipulation or district court decree mentions a move. *Contra In re Marriage of Stone*, No. 17-0757, 2017 WL 6026726, at *2 (Iowa Ct. App. Nov. 22, 2017) (finding a move was previously contemplated when the father had already moved to Michigan and the decree referenced his Michigan address); *Gragg v. Smith*, No. 03-1493, 2004 WL

---

[4] Her DHS services included random drug testing, which came back negative for all substances.

[5] Still, we note that while it is undisputed that Jesse cares for his children, the district court found that Sara was the parent better able to minister to their needs. As the parties provided competing accounts about each parent's ability to care for the children, the decision came down to a credibility finding; we give great weight to the credibility determinations of the district court as it gets to see the parties in person and hear their testimony first hand. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423–24 (Iowa 1984) ("There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses.").

360570, at *1 (Iowa Ct. App. Feb. 2, 2004) (noting a parent's cross-country move was explicitly noted in the custody decree). And she did stay for nearly a year before petitioning to modify the visitation schedule to accommodate her move. Further, we agree with the district court that the move is in the children's best interests, and Jesse does not challenge this finding. While Jesse also contends Sara's motive in moving was to interfere with his relationship with the children, the visitation schedule offered by Sara refutes that claim. *See Frederici*, 338 N.W.2d at 160 (considering if the parent intended to defeat visitation rights or interfere with the relationship between the other parent and the children). Rather, Sara proposed a visitation schedule that gave Jesse a similar amount of overnight visits with his children as he exercised when they lived in Iowa. Because Sara met her burden, we find no reason to disturb the district court's modification of the visitation schedule.

### C. Trial Concerns.

Finally, Jesse alleges several concerns over the process of his trial that seem to relate to fairness concerns. Those trial concerns Jesse raises are: (1) whether the judge was fair and impartial as required under Iowa Code of Judicial Conduct 51:2.2; (2) if the court should have found Sara in default; (3) whether Sara's counsel lied, misled, or misrepresented the facts to the court; (4) whether the district court was wrong not to allow Jesse to read from notes during his testimony; (5) whether the district court discriminated against Jesse on the basis of sex; (6) whether the district court took too long to issue its ruling; and (7) whether the district court abused its discretion in awarding Sara attorney fees. We address each issue in turn.

*i. Iowa Code of Judicial Conduct 51:2.2.*

In his first section of argument, Jesse puts forward a litany of errors he believes the district court made. They all boil down to a common theme—that the court gave Sara too much credit and him not enough. Jesse states the court's behavior ran afoul of Iowa Code of Judicial Conduct rule 51:2.2,[6] which states, "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Comment two clarifies, "Although each judge comes to the bench with a unique background and personal philosophy, a judge must interpret and apply the law without regard to whether the judge approves or disapproves of the law in question." Iowa Code of Judicial Conduct r. 51:2.2 cmt. 2. Jesse points to some minor factual errors and moments where he found the court unsympathetic to his cause; still, he has failed to show how this behavior violated the rules of judicial conduct or the law, and we address the issue no further. *See* Iowa R. App. P. 6.903(3)(g)(3); *see also* Iowa Code of Judicial Conduct r. 51:2.2 cmt. 3 ("When applying and interpreting the law, a judge sometimes may make good-faith errors of fact or law. Errors of this kind do not violate this rule.").

---

[6] This rule is typically cited in recusal cases. *See, e.g.*, *In re Marriage of Herum*, No. 17-2092, 2018 WL 4635908, at *2 (Iowa Ct. App. Sept. 26, 2018). Insofar as Jesse is asserting the judge should have recused himself, we note that Jesse would have to prove the court had "personal bias or prejudice stemming from an extrajudicial source." *Id.* (citation omitted). A "[j]udicial predilection or an attitude of mind resulting from the facts learned by the judge from the judge's participation in the case" is no reason for a judge to be disqualified. *State v. Millsap*, 704 N.W.2d 426, 432 (Iowa 2005). He would also have to prove prejudice resulted. *See id.* He does not make these arguments, and we will not make them for him. *See In re Estate of DeTar*, 572 N.W.2d 178, 180 (Iowa Ct. App. 1997) ("Iowa law dictates that [a pro se party's] brief is judged by the same standard as a brief filed by an Iowa lawyer.").

*ii. Default.*

Jesse next argues that Sara was in default when she failed to answer Jesse's counterclaim and the court should have entered judgment for him on his request for physical care. "A decision to grant or deny a motion for default judgment rests in the sound discretion of the trial court." *In re Marriage of Christenson*, No. 17-2022, 2018 WL 4915910, at *5 (Iowa Ct. App. Oct. 10, 2018) (citing *Jack v. P & A Farms, Ltd.,* 822 N.W.2d 511, 515 (Iowa 2012)). "We will only reverse the court's decision if its discretion has been abused." *Id.* And courts generally are wary, particularly in matters involving children's welfare, to grant default judgment on a case that could be heard on the merits to better determine what is in the best interests of the children. *Id.* "[I]n an action for custody, the court's ultimate ruling must be governed by the child's best interests—not a sanction." *Carmichael v. Philpott*, No. 17-0124, 2018 WL 739275, at *3 (Iowa Ct. App. Feb. 7, 2018). Jesse makes a conclusory statement that Sara's failure to answer his counterclaim did not bear in mind the best interests of their children— we find no support of this in the record, nor do we find the court abused its discretion in denying the request for default judgment.

*iii. Attorney Sanctions.*

Jesse next seeks to have Sara's attorney sanctioned, accusing counsel of lying, misleading, and misrepresenting the facts to the court in violation of Iowa Rule of Civil Procedure 1.413(1).[7] Specifically, he states that counsel did not make

---

[7] The rule states:
> Pleadings need not be verified unless special statutes so require and, where a pleading is verified, it is not necessary that subsequent pleadings be verified unless special statutes so require.

"reasonable inquiry" into the claims asserted in the filings. "We review a district court's decision on whether to impose sanctions for an abuse of discretion." *Barnhill v. Iowa Dist. Ct.*, 765 N.W.2d 267, 272 (Iowa 2009). We give deference to the district court, who "is in the best position to evaluate counsel's actions and motivations" when deciding if counsel has breached the "fine line . . . between zealous advocacy and frivolous claims." *Id.* at 279. In determining if rule 1.413(1) was complied with, the court determines if a reasonably competent attorney could reasonably act that way under the circumstances. *Id.* at 272. Jesse has not shown that Sara's counsel acted in a way no reasonable attorney would—rather, he points out disputed facts that are par for the course in any trial. *Contra id.* at 279 (stating an attorney violated rule 1.413 when they made up [the case] as it went along" (alteration in original)). There is no indication that the case was filed in bad faith as Jesse alleges. As such, we agree with the district court that sanctions were not appropriate.

*iv. Trial Notes.*

Jesse argues the district court was wrong to stop him from using his notes while on the stand to bolster his direct examination. He cites to both the Iowa Constitution and United States Constitution,[8] arguing the law was applied

---

Counsel's signature to every motion, pleading, or other paper shall be deemed a certificate that: counsel has read the motion, pleading, or other paper; that to the best of counsel's knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or cause an unnecessary delay or needless increase in the cost of litigation.

[8] He cites article I, section six of the Iowa Constitution, which states "All laws of a general nature shall have a uniform operation; the general assembly shall not grant

disparately between he and Sara's counsel, who was allowed to use notes while questioning witnesses. Contrary to his position, the court allowed him to use his notes to keep track of the points he wanted to address while testifying on direct examination, as Sara's counsel was also allowed. But, just as Jesse was not allowed to read his notes to refresh his recollection while testifying, neither was Sara. Jesse's argument fails.

*v. Court's Purported Bias against Men.*

Pointing to the same constitutional sections as his argument about the use of notes, Jesse argues the district court violated his constitutional rights by favoring Sara because she was a woman. On our de novo review, we see nothing in the record to support this assertion. *See State v. Banks*, No. 18-0721, 2020 WL 105078, at *6 (Iowa Ct. App. Jan. 9, 2020) ("We do not reach the merits of any of these arguments as they are . . . not developed enough to be a cognizable legal claim. . . . If we were to proceed to consider the merits, 'this case would require us to assume a partisan role and undertake the appellant's research and advocacy. This role is one we refuse to assume.'" (citation omitted)).

---

to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." He also relies on section one of the Fourteenth Amendment to the United States Constitution, which states:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

*vi. Length of Time to Issue Ruling.*

Jesse next takes issue with the nearly five months that passed between the final hearing and the court's orders. It is true that "[n]o matter the complexity of an issue before a court, judicial decisions ordinarily should be reached within sixty days after submission." *State v. Fordyce*, 940 N.W.2d 419, 428 (Iowa 2020) (discussing an eleven-month delay); *see also* Iowa Ct. R. 22.10 (requiring each district judge to submit to the supreme court a report of each case still under advisement after sixty days along with "an explanation of the reasons for the delay and an expected date of decision"). But, as in *Fordyce*, "the detail in the district court's findings belie any claim that the delay diminished its ability to recall the evidence." *See id.* at 428; *see also Poole v. Hawkeye Area Cmty. Action Program, Inc.*, 666 N.W.2d 560, 562 (Iowa 2003) (discussing a sixteen-month delay). The district court here authored thorough findings of fact supported by the record made at trial in both its modification and permanent injunction orders. We find no reason here to allow the delay to undermine the district court's findings.

*vii. Attorney Fees.*

Jesse argues the court abused its discretion by awarding Sara $2000 in attorney fees. Iowa Code section 598.36 says the district court "may award attorney fees to the prevailing party in an amount deemed reasonable by the court." "We have emphasized that the language of the provision is permissive." *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). "The decision to award attorney fees rests within the sound discretion of the court, and we will not disturb its decision absent a finding of abuse of discretion." *In re Marriage of Rosenfeld*, 668 N.W.2d 840, 849 (Iowa 2003). "Whether attorney fees should be awarded

depends on the respective abilities of the parties to pay. In addition, the fees must be fair and reasonable." *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994) (internal citation omitted). Based on the record in front of us, we find no abuse of discretion here and uphold the district court's award of attorney fees.

We also note that Sara requests appellate attorney fees. We consider whether the party seeking the fees was required to defend the district court's order on appeal. *See In re Marriage of Maher*, 596 N.W.2d 561, 568 (Iowa 1999). Considering the parties disparate incomes, the fact that Jesse instigated the appeal, and that Sara has prevailed on each claim, we grant Sara attorney fees and remand the issue to the district court to determine an appropriate and reasonable amount.

**Conclusion.**

For all the reasons stated above, we affirm the district court's modification and injunction rulings and remand for the limited purpose of determining the appropriate amount of appellate attorney fees.

**AFFIRMED AND REMANDED WITH INSTRUCTION.**