# In The Iowa Supreme Court

No. 23–1186

Submitted October 8, 2024—Filed November 22, 2024

**Summit Carbon Solutions, LLC,**

Appellee,

vs.

**Kent Kasischke,**

Appellant.

Appeal from the Iowa District Court for Hardin County, Amy M. Moore, Judge.

A landowner appeals a judgment allowing a pipeline surveyor access to his private property under Iowa Code section 479B.15. **Affirmed.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

Brian E. Jorde (argued) and Christian T. Williams of DominaLaw Group pc llo, Omaha, Nebraska, for appellant.

Ryan G. Koopmans (argued) of Koopmans Law Group, LLC, Des Moines; Bret A. Dublinske, Brant M. Leonard, Kristy Dahl Rogers, and Nicci M. Ledbetter of Fredrikson & Byron, P.A., Des Moines; Brian D. Boone and Michael R. Hoernlein of Alston & Bird LLP, Charlotte, North Carolina; and Karla M. Doe and Andrea L. Galvez of Alston & Bird LLP, Atlanta, Georgia, for appellee.

Jason W. Grams and Theodore T. Appel (until withdrawal), of Lamson, Dugan & Murray, LLP, West Des Moines, for amici curiae Liquid Energy Pipeline Association and American Petroleum Institute.

Tara Z. Hall of Dentons Davis Brown PC, Des Moines, and Colin Smith, of Sullivan & Ward, West Des Moines, for amici curiae Iowa Utility Association and Iowa Association of Electric Cooperatives.

**Waterman, Justice.**

This appeal presents our court's first, limited, foray into legal challenges to a proposed underground carbon dioxide pipeline. A Hardin County landowner refused to allow a surveyor for the pipeline developer to enter his private property. The district court ordered the landowner to allow the surveyor temporary access pursuant to Iowa Code section 479B.15 (2021), which governs hazardous liquid pipelines. The district court rejected the landowner's claim that this legislative enactment is facially unconstitutional under the "takings" clauses of the Fifth Amendment to the U.S. Constitution and article I, section 18 of the Iowa Constitution. The district court also rejected the landowner's argument that chapter 479B did not apply because carbon dioxide is not a "hazardous liquid" when transported through the pipeline in a supercritical state. The district court ruled the party seeking access was a "pipeline company" with access rights under section 479B.15 and provided proper statutory notice to the landowner. The landowner appealed, and we retained the case.

On our review, we hold that the district court correctly rejected this facial challenge to section 479B.15 under both the Federal and Iowa Constitutions. Although even temporary compelled access can constitute an unconstitutional taking, *see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021), the access for surveyors granted under section 479B.15 is a lawful "pre-existing limitation upon the land owner's title." *See id.* at 160 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028–29 (1992)). The supreme courts of North Dakota and South Dakota have already reached the same conclusion as to this proposed pipeline. *See SCS Carbon Transp. LLC v. Malloy*, 7 N.W.3d 268, 271–72 (N.D. 2024); *Betty Jean Strom Tr. v. SCS Carbon Transp., LLC*, 11 N.W.3d 71, 93–94 (S.D. 2024). The record supports the district court's finding that proper notice was given. We further hold that the supercritical carbon dioxide to be transported in the

pipeline is a "hazardous liquid" within the meaning of section 479B.2. The district court therefore correctly ruled that the plaintiff is a pipeline company allowed to obtain temporary access for its surveyors onto private property. For the reasons more fully explained below, we affirm the district court's judgment.

## I. Background Facts and Proceedings

Summit Carbon Solutions, LLC, (Summit) is developing a multistate pipeline system to transport carbon dioxide captured at corn ethanol production facilities to North Dakota, where it will be sequestered underground. The project is touted as ameliorating climate change by removing carbon dioxide from the atmosphere that would otherwise contribute to global warming. The project's supporters argue it will enhance the marketability of corn ethanol fuel and thereby raise corn prices, a key contributor to the Iowa economy. Summit proposes to build a network of underground pipelines extending over 2,000 miles across five states: Iowa, Minnesota, Nebraska, South Dakota, and North Dakota. The proposed pipeline would cover over 700 miles in Iowa across thirty counties, including Hardin County, where Kent Kasischke owns land in its path.

On September 13, 2021, Summit conducted an informational meeting in Hardin County about its proposed pipeline, as required by Iowa Code section 479B.4. On January 28, 2022, Summit filed a petition with the Iowa Utilities Board (IUB)[1] for a permit to construct, operate, and maintain the pipeline. The IUB conducted a twenty-five-day public hearing on Summit's application. Meanwhile, Summit negotiated voluntary easements with many landowners in the proposed pipeline's path, and Summit or its affiliates executed

---

[1]The Iowa Utilities Board has been renamed the "Iowa Utilities Commission." Press Release, Iowa Utils. Comm'n, *Iowa Utilities Board is now Iowa Utilities Commission* (July 2, 2024), https://iuc.iowa.gov/press-release/2024-07-02/iowa-utilities-board-now-iowa-utilities-commission [https://perma.cc/GEJ5-A2L8]. Our opinion refers to the agency as the "Iowa Utilities Board" as it was known during the district court proceedings under review.

agreements with future customers at corn ethanol production sites to capture their carbon dioxide for transport and sequestration in North Dakota.

Summit sought access to land along the proposed route to complete preliminary civil, environmental, archaeological, and soil surveys and investigations. Kasischke denied Summit access to his land. Summit sought to compel access under Iowa Code section 479B.15, which provides:

> After the informational meeting or after the filing of a petition if no informational meeting is required, a pipeline company may enter upon private land for the purpose of surveying and examining the land to determine direction or depth of pipelines by giving ten days' written notice by restricted certified mail to the landowner as defined in section 479B.4 and to any person residing on or in possession of the land. The entry for land surveys shall not be deemed a trespass and may be aided by injunction. The pipeline company shall pay the actual damages caused by the entry, survey, and examination.

Summit sent a letter to Kasischke on March 12, in an envelope marked as "USPS CERTIFIED MAIL" and "RESTRICTED DELIVERY." The letter notified Kasischke of Summit's intent to enter his property to conduct a survey "not less than ten (10) days from the date of this notice." The letter asked Kasischke to identify any tenants on the property so that they could be notified. The letter was delivered to Kasischke on March 19, and he signed a return slip indicating his receipt. Kasischke continued to deny Summit access and identified no tenant.

On July 14, Summit sent a second letter to Kasischke by restricted certified mail again requesting access to his property. This letter threatened legal action if Kasischke continued to refuse access to surveyors. The letter was again sent in an envelope marked as "USPS CERTIFIED MAIL" with the notation "RESTRICTED DELIVERY." Kasischke refused to accept delivery of this letter.

On September 19, Summit filed a petition for injunctive relief to compel access under section 479B.15. Summit filed an amended petition on October 19. Summit alleged that it is a pipeline company as defined by section 479B.2, that

it complied with the statutory requirements to gain access to the property, and that Kasischke denied Summit access. Kasischke filed an answer to the petition in which he admitted that Summit was a pipeline company for purposes of section 479B.15. But Kasischke alleged that Summit failed to satisfy the statutory notice requirements and failed to prove the requisite irreparable harm for injunctive relief. Kasischke counterclaimed, asserting a facial challenge to Iowa Code section 479B.15. He argued that section 479B.15 falls within a new category of "*per se* takings" recognized in *Cedar Point Nursery v. Hassid. See* 594 U.S. at 149.

On March 17, 2023, Summit moved for summary judgment on grounds that section 479B.15 is facially constitutional and that Summit had satisfied the statutory requirements for entry. Kasischke's resistance claimed for the first time that he had a previously undisclosed tenant who had not received notice. On May 4, Summit mailed a third letter by restricted certified mail to include the alleged tenant. Summit narrowed its summary judgment motion to the constitutional claim. On May 10, the district court granted partial summary judgment rejecting Kasischke's constitutional challenge, stating:

> Iowa law makes clear that survey access is a long-recognized background restriction on private property. . . . Nationally, all fifty states have a statutory allowance for entities to enter private property for pre-condemnation surveys without trespass liability. Based upon the foregoing, the court finds that section 479B.15 falls well within the background restrictions identified in *Cedar Point*, which renders its holding inapplicable to Mr. Kasischke's challenge.

(Citation omitted.)

On May 16, the district court conducted a bench trial on the remaining issues of Summit's compliance with the statute. During this trial, Kasischke orally moved to amend his answer to deny for the first time that Summit is a pipeline company within the meaning of section 479B.15. The district court

allowed the amendment and permitted the parties to submit additional evidence and briefing on that issue.

Kasischke testified about his interactions with Summit. In his direct testimony, he denied ever receiving the March 12, 2022 letter. On cross-examination, he acknowledged the return receipt "appeared" to bear his signature. He denied refusing delivery of the July 14 letter but admitted he had discussed with neighbors the strategy of refusing delivery of any letter requesting access to their properties. He named someone as his cash rent tenant for nine years but offered no documentation of any lease, payments, or other evidence of the tenancy. Kasischke's alleged tenant did not testify or file an appearance or affidavit.

Kasischke submitted the affidavits of two chemical engineers who opined that carbon dioxide in its supercritical state differs from its liquid state. One of these experts explained:

> Another way to look at this is that Summit or CSC can require facilities injecting into their pipeline at various points as supercritical fluid at temperatures and pressures above the critical point, but once the temperature along the pipeline falls to below about 88 °F, *the material i[s] no longer supercritical but a liquid . . . , and would make that segment of pipeline if within Iowa I believe a pipeline company.*

(Emphasis added.) He "conclude[d] the proposed pipeline system will be largely operated in liquid phase." Summit submitted an affidavit from its chief operating officer, who described the process of transforming carbon dioxide into its supercritical state as "pressurized above its critical point, which results in converting the [carbon dioxide] to a fluid state."

On July 11, the district court ruled for Summit on all remaining issues. The court questioned the credibility of Kasischke's experts because "neither affiant identifie[d] their education, training, background or experience" and "both

affidavits are nearly identical to one another, despite the fact that neither affiant attests to any familiarity with the other." The court credited Summit's expert and "based upon the evidentiary record, the Iowa Legislature's purpose in enacting Chapter 479B, and the plain meaning of the terms utilized in that chapter," determined Summit is a pipeline company within the meaning of the statute. The court concluded that

> it would be nonsensical to hold that companies transporting carbon dioxide through pipelines at higher temperatures and higher pressures than carbon dioxide in its liquid phase are exempt [from chapter 479B] . . . regardless of the fact that carbon dioxide being transported may not always meet a scientifically precise definition of "liquefied" at every moment in the transportation process.

The district court noted that federal courts and regulators have determined that supercritical carbon dioxide is a hazardous liquid under the federal Pipeline Safety Act (PSA).

The district court found that the letters sent to Kasischke satisfied the statutory notice requirements while noting "Mr. Kasischke's clearly evasive and implausible testimony regarding Summit's mailings." The court found that there was no tenant on Kasischke's property at issue who required additional notice. The court observed that "it [is] highly improbable that [Kasischke] could not have produced at least a modicum of written evidence, whether in the form of a lease agreement, payment record, or other documentation, to support his assertion that a leasehold exists." Finally, the court ruled that Summit did not need to show irreparable harm because the statute itself permitted injunctive relief. The district court entered judgment enjoining Kasischke from interfering with Summit's "entry upon his land for the purpose of surveying and examining the land to determine the direction or depth of its proposed pipeline."

Kasischke appealed, and we retained the case.

**II. Standard of Review**

We review constitutional challenges to statutes de novo. *Kluender v. Plum Grove Invests., Inc.*, 985 N.W.2d 466, 469 (Iowa 2023). "[W]e presume statutes are constitutional, 'imposing on the challenger the heavy burden of rebutting that presumption.' " *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022) (quoting *Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001)). "[I]n a facial challenge, the challenger must prove that a statute is 'totally invalid and therefore, incapable of any valid application.' " *Kluender*, 985 N.W.2d at 470 (emphasis omitted) (quoting *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 766 (Iowa 2019)). "A facial challenge asserts the law always operates unconstitutionally and not just as applied in particular circumstances," making it the most difficult challenge a plaintiff can mount. *League of United Latin Am. Citizens of Iowa v. Pate*, 950 N.W.2d 204, 209 (Iowa 2020) (per curiam). Facial challenges are disfavored because they "run contrary to the fundamental principle of judicial restraint." *Kluender*, 985 N.W.2d at 470 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). If there is any set of facts where the statute could be held constitutional, we will reject the facial challenge. *See id.*

"We review rulings on statutory interpretation for correction of errors at law." *EMC Ins. Grp., Inc. v. Shepard*, 960 N.W.2d 661, 668 (Iowa 2021). We review rulings granting summary judgment for correction of errors at law. *Id.*

We review de novo a district court's order issuing an injunction. *City of Okoboji v. Parks*, 830 N.W.2d 300, 304 (Iowa 2013). " 'Although the trial court's factual findings are not binding' in an action seeking an injunction, 'we give weight to the court's assessment of the credibility of the witnesses.' " *Id.* (quoting *Opat v. Ludeking*, 666 N.W.2d 597, 603 (Iowa 2003)).

### III. Analysis

We first address Kasischke's facial constitutional challenge to section 479B.15. Then we address whether the district court correctly determined that Summit satisfied the statutory requirements for an injunction under that statute.

**A. Whether Section 479B.15 Is Facially Unconstitutional Under the Takings Clauses.** The district court rejected Kasischke's facial challenge to section 479B.15 under the Federal and Iowa Constitutions. We reach the same conclusion.

The Takings Clause of the Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Iowa Constitution's takings clause is similar: "Private property shall not be taken for public use without just compensation first being made . . . ." Iowa Const. art. I, § 18. Kasischke argues that Iowa Code section 479B.15 is facially unconstitutional under both the Federal and Iowa Clauses because the access granted surveyors "takes" his property right to exclude them. Kasischke recognizes that section 479B.15 requires "[t]he pipeline company [to] pay the actual damages caused by the entry, survey, and examination" but argues that the mere entry onto his property to conduct the survey is itself a taking of his right to exclude all others, for which he is also entitled to just compensation. Kasischke's constitutional claim fails because the statute did not take away a property right that he owned. Rather, he has no right to exclude the surveyor because section 479B.15 is a lawful pre-existing limitation on his title to the land.

"We have said that we consider federal cases interpreting the Federal Takings Clause 'persuasive in our interpretation of the state provision,' but 'not binding.' " *Puntenney v. Iowa Utils. Bd.*, 928 N.W.2d 829, 844 (Iowa 2019)

(quoting *Kingsway Cathedral v. Iowa Dep't of Transp.*, 711 N.W.2d 6, 9 (Iowa 2006)). Indeed, in *Puntenney v. Iowa Utilities Board*, we rejected the United States Supreme Court's interpretation of "public use" in our own takings clause and instead adopted Justice O'Connor's dissent in *Kelo v. City of New London*, 545 U.S. 469, 497 (2005) (O'Connor, J., dissenting). "We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (quoting *State v. Brooks*, 888 N.W.2d 406, 410–11 (Iowa 2016)).

At least four Iowa district court judges have adjudicated facial constitutional "takings" challenges to Iowa Code section 479B.15. Three upheld the constitutionality of the statute, including the ruling in this case. *See Navigator Heartland Greenway, LLC v. Hulse*, No. EQCV204557, 2023 WL 5338305, at *5 (Iowa Dist. Ct. May 30, 2023); *Summit Carbon Sols., LLC v. Kasischke*, No. CVCV101911, 2023 WL 5338286, at *6 (Iowa Dist. Ct. May 10, 2023); *Dakota Access, LLC v. Johnson*, No. EQCV040450, 2015 WL 14022674, at *10 (Iowa Dist. Ct. Aug. 7, 2015). One district court ruled that section 479B.15 is unconstitutional. *Navigator Heartland Greenway, LLC v. Koenig*, No. EQCV034863, 2023 WL 5333334, at *9 (Iowa Dist. Ct. May 3, 2023). We decide the facial challenge today.

To determine whether a statute unconstitutionally takes property, we apply a three-step test: "(1) Is there a constitutionally protected private property interest at stake? (2) Has this private property interest been 'taken' by the government for public use? and (3) If the protected property interest has been taken, has just compensation been paid to the owner?" *City of Eagle Grove v. Cahalan Invs., LLC*, 904 N.W.2d 552, 560 (Iowa 2017) (quoting *Kingsway*

*Cathedral*, 711 N.W.2d at 9). The fighting issue in this case is limited to prong two: whether private property has been taken.

A taking traditionally occurs in one of three ways:

(1) a per se taking arising from a permanent physical invasion of property, (2) a per se taking arising from regulation that denies the owner all economically beneficial ownership, and (3) a regulatory taking based on the balancing of the three *Penn Central* factors.

*Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 545 (Iowa 2017) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)); *see also Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (identifying the same three types of takings). Kasischke does not argue that Iowa Code section 479B.15 fits into any of these traditional categories. Instead, Kasischke argues that *Cedar Point Nursery* "established a new *per se* rule—when the government, by regulation or otherwise, appropriates a right to physically invade private property, it has exercised a physical taking for which just compensation is owed."

*Cedar Point Nursery* concerned a California regulation that required growers to allow "access by union organizers to the[ir] premises . . . for the purpose of meeting and talking with employees and soliciting their support." *Cedar Point Nursery*, 594 U.S. at 144 (quoting Cal. Code Regs., tit. 8, § 20900(e)). Specifically, agricultural employers were required to permit union organizers on their property "for up to four 30-day periods in one calendar year." *Id.* The organizers could enter the property and talk to employers "for up to one hour before work, one hour during the lunch break, and one hour after work." *Id.* To obtain this access, the labor organization needed to file a written notice to the state Agricultural Labor Relations Board and the employer. *Id.*

A dispute over access arose between Cedar Point Nursery and the United Farm Workers Union. *Id.* at 145. Cedar Point Nursery sued, claiming the regulation constituted a per se taking under the Fifth Amendment. *Id.* The

Supreme Court agreed and held the regulation constituted a per se taking. *Id.* at 162. Typically, when a regulation burdens a landowner's property rights, the Court had applied the balancing test enunciated in *Penn Central. See id.* at 158. But the *Cedar Point Nursery* Court concluded that "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place." *Id.* at 149. Because the California regulation "appropriates a right to invade the growers' property [the regulation] constitutes a *per se* physical taking" in violation of the Fifth Amendment. *Id.*

*Cedar Point Nursery's* holding is expressly limited by three exceptions. "*First*, . . . [i]solated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts [of trespass] rather than appropriations of a property right." *Id.* at 159. "*Second*, many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id.* at 160. Indeed, "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the land owner's title.' " *Id.* (quoting *Lucas*, 505 U.S. at 1028–29). "*Third*, the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Id.* at 161.

Summit argues that survey access is a longstanding background restriction and therefore a recognized exception to the Court's per se taking jurisprudence. We agree. "The law has . . . long recognized a right to enter land to survey it for eminent domain or other public purposes." Bethany R. Berger, *Property and the Right to Enter*, 80 Wash. & Lee. L. Rev. 71, 101 (2023). In fact, statutes authorizing entry to conduct surveys are as old as the republic itself. *Id.* at n.187 (observing Pennsylvania's survey entry law was first enacted in 1782). Throughout the 1800s, courts across the country routinely held that

entry onto private property for the purpose of conducting a survey was not a taking. *See, e.g., Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 831 (C.C.D.N.J. 1830) (No. 1,617) ("An entry on private property for the sole purpose of making the necessary explorations for location [of a railroad], is not taking it . . . ."); *Walther v. Warner*, 25 Mo. 277, 289 (1857) ("We are not to be understood, however, as denying to the Legislature the power of authorizing an entry upon private property, without compensation, for the purpose of making the preliminary examinations and surveys before the location of the road."); *Bloodgood v. Mohawk & Hudson R.R.*, 18 Wend. 9, 12 (N.Y. 1837) ("The law contemplates and authorizes an entry and possession for the purposes of survey and examination, and for the construction of the road *prior* to the attempt to agree . . . ."); *Lyon v. Green Bay & Minn. Ry.*, 42 Wis. 538, 544 (1877) ("It would seem that a railroad company must, of necessity, be permitted to go upon lands for the purpose of surveying and locating the line of its road . . . ."). Judge Thomas Cooley recognized this principle in a famous constitutional treatise from the 1800s saying "[n]o constitutional principle . . . is violated by a statute which allows private property to be entered upon and temporarily occupied for the purpose of survey." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 560 (2d ed. 1871).

Throughout the twentieth century, technological advances led to surveys for new purposes, such as finding appropriate routes for electrical power lines. *See, e.g., Wood v. Miss. Power Co.*, 146 So. 2d 546, 549 (Miss. 1962) ("[T]he Power Company had the right . . . to enter upon the appellant's land and make such examination and survey as was necessary for the proper location of the proposed transmission line."). As the purposes for these surveys expanded, legislatures and courts continued to allow access to private property. *See, e.g., State v.*

*Simons*, 40 So. 662, 662 (Ala. 1906) ("The entering upon the premises for the purposes of 'examinations and surveys . . .' [is] not a violation of the constitutional provision which requires that just compensation shall first be paid before property is condemned and taken . . . ."); *Penn v. Carolina Va. Coastal Corp.*, 57 S.E.2d 817, 820 (N.C. 1950) ("[P]reliminary surveys [for determining location of toll road] . . . are insufficient to constitute a taking . . . ."); *Cleveland Bakers Union Loc. No. 19 Pension Fund v. State*, 443 N.E.2d 999, 1002 (Ohio Ct. App. 1981) ("The overwhelming majority of courts . . . have held that entry onto private property . . . for the purpose of conducting preliminary surveys and appraisals, does not amount to a 'taking' for which compensation must be awarded."). Today, all fifty states have statutes authorizing entry to private property for the purpose of conducting preliminary land surveys in exercising eminent domain. *Palmer v. Atl. Coast Pipeline, LLC*, 801 S.E.2d 414, 418 & n.2 (Va. 2017).

Iowa, too, has long authorized statutory access to private property to conduct land surveys. In 1843 (prior to Iowa's statehood), our territorial law permitted surveyors to enter private property to determine routes for roadways. Iowa Rev. Stat. ch. 152, § 21–22 (Terr. 1843). In 1851, Iowa law allowed railroad surveyors to "enter[] upon the land of another for the purpose of making the requisite examination and surveys" before condemnation. Iowa Code § 778 (1851). Iowa law continued to allow surveyors to "enter upon the land [of another] and run a survey" for purposes of constructing a highway. Iowa Code § 4658.1 (1939).

If we were to hold that section 479B.15 is facially unconstitutional, we would call into question the constitutionality of many similar Iowa statutes allowing temporary access for private as well as government surveyors and examiners. *See, e.g.,* Iowa Code § 479.30 (2021) (permitting temporary access to

private properties for natural gas pipeline companies to conduct surveys); *id.* § 314.9(1) ("The agency in control of a highway may . . . enter upon private property for the purpose of making surveys . . . ."); *id.* § 478.15 (allowing private entities, who first obtain a permit, to enter private property and conduct surveys for potential power line routes); *id.* § 456.5 ("[T]he state geologist and the state geologist's assistants and employees shall have authority to enter and cross all lands within the state . . . ."); *id.* § 455B.426(2) ("In the evaluation of known or suspected hazardous waste or hazardous substance disposal sites, the director [of the department of natural resources] may enter private property and perform tests and analyses."); *id.* § 161A.51 ("The commissioners [of soil and water conservation] and their authorized agents or employees may enter upon any private or public property . . . to determine whether soil erosion is occurring on the property . . . ."); *id.* § 403.6(3) (authorizing municipalities to enter private property to conduct surveys). Section 479B.15[2] is but one of many Iowa enactments requiring private landowners to allow access to surveyors.

The California regulation struck down in *Cedar Point Nursery* is quite different from the limited access allowed for surveyors. The California regulation required access for union organizers to private property for three hours daily for 120 days (four, thirty-day periods) per calendar year. *Cedar Point Nursery*,

---

[2]The provisions in Iowa Code chapter 479B were transferred from chapter 479 in 1995, *see* 1995 Iowa Acts ch. 192, in response to *Kinley Corporation v. Iowa Utilities Board*, 999 F.2d 354 (8th Cir. 1993). Prior to *Kinley*, hazardous liquid pipelines had been regulated under Iowa Code chapter 479, which governed the use and safety of underground pipelines generally. *See* Iowa Code § 479.1 (1991) (explaining the purpose of the statute is the provide administrative power to supervise pipelines generally except for water and interstate natural gas pipelines). In *Kinley*, the United States Court of Appeals for the Eighth Circuit held that the regulation of *safety* standards for hazardous liquid pipelines had been preempted by an act of Congress. 999 F.2d at 358. The Iowa Legislature enacted chapter 479B to regulate hazardous liquid pipelines separately while allowing state safety regulation of other pipelines. *Cf.* Iowa Code § 479.1 (Supp. 1995) (providing authority to regulate use and safety of pipelines that are not "hazardous liquid pipelines"); *see id.* § 479B.1 (providing authority to "implement certain controls over hazardous liquid pipelines").

594 U.S. at 144; Cal. Code Regs., tit. 8, § 20900(e). By contrast, access under the Iowa enactment is for the one-time limited purpose of surveying the proposed route to determine the pipeline's direction and depth. *See* Iowa Code § 479B.15.

Two of our neighboring states have rejected facial constitutional challenges to statutes allowing surveyor access for this carbon dioxide pipeline project. In *SCS Carbon Transport LLC v. Malloy* the North Dakota Supreme Court held that the state's access statute was not an unconstitutional taking. 7 N.W.3d at 271–72.[3] Rather, "[t]he entry statute codifies a background principle of state property law as a limitation on the bundle of sticks that state law defines as property rights." *Id.* at 277. Because the entry was consistent with longstanding background restrictions, the court held that the entry authorized by the statute was not a taking. *Id.*

In *Betty Jean Strom Trust v. SCS Carbon Transport, LLC*, the South Dakota Supreme Court reached the same conclusion in rejecting a takings challenge to that state's surveyor access statute. *See* 11 N.W.3d at 93–94.[4] The court held

---

[3]The North Dakota statute provides:

> In all cases when land is required for public use, the person or corporation, or the person's or corporation's agents, in charge of such use may survey and locate the same, but it must be located in the manner which will be compatible with the greatest public benefit and the least private injury and subject to the provisions of section 32-15-21. Whoever is in charge of such public use may enter upon the land and make examinations, surveys, and maps thereof, and such entry constitutes no claim for relief in favor of the owner of the land except for injuries resulting from negligence, wantonness, or malice.

N.D. Cent. Code § 32-15-06 (2023).

[4]The South Dakota statute provides:

> The provisions of this section only apply to a project which requires a siting permit pursuant to chapter 49-41B. Each person vested with authority to take private property for public use may cause an examination and survey to be made as necessary for its proposed facilities. The person or the person's agents and officers may enter the private property for the purpose of the examination and survey. Any person seeking to cause an examination or survey, where permission for examination or survey has been denied, shall:
>
> (1) Have filed a siting permit application with the Public Utilities Commission pursuant to § 49-41B-11;

that "limited pre-condemnation standard surveys are a longstanding background restriction on property rights" and therefore do not violate the Fifth Amendment. *Id.* Kasischke cites no on-point contrary authority from any jurisdiction holding an equivalent surveyor access statute effectuates a taking. We do not read *Cedar Point Nursery* as upending centuries of survey-access laws in all fifty states, nor has any other court.

We hold that land surveys allowed in Iowa Code section 479B.15 are longstanding background restrictions that permit temporary access onto private property without triggering a constitutional taking. Kasischke's facial constitutional challenge fails.

**B. Whether Summit Is a "Pipeline Company" Within the Meaning of Chapter 479B.** Kasischke argues that the district court erred by ruling that Summit is a pipeline company within the meaning of Iowa Code section 479B.15. The parties agree that Summit plans to transport carbon dioxide in a "supercritical" state. Kasischke admitted in pleadings at the outset of this litigation that Summit is a "pipeline company." He changed his position at trial to deny that Summit is a pipeline company based on his new position that the carbon dioxide is not transported in a liquid state in the pipeline. We must decide whether supercritical carbon dioxide can be considered a "hazardous liquid" under chapter 479B. This presents a question of statutory interpretation.

We read the statute as a whole. *Doe v. State,* 943 N.W.2d 608, 610 (Iowa 2020). The legislature codified the purpose of chapter 479B:

> It is the purpose of the general assembly in enacting this law to grant the utilities board the authority to implement certain

---

(2) Give thirty days written notice, including the filing and expected dates of entry, to the owner and any tenant in possession of the private property; and

(3) Make a payment to the owner, or provide sufficient security for the payment, for any actual damage done to the property by the entry.

S.D. Codified Laws § 21-35-31 (2023).

> controls over hazardous liquid pipelines *to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline* or underground storage facility within the state, to approve the location and route of hazardous liquid pipelines, and to grant rights of eminent domain where necessary.

Iowa Code § 479B.1 (emphasis added). It is undisputed that carbon dioxide in its supercritical state can be hazardous if released by a pipeline rupture near people. Regulation of pipelines transporting supercritical carbon dioxide furthers the purpose of chapter 479B.

Section 479B.2(4) defines a "*pipeline company*" as a company "organized for the purpose of owning, operating, or controlling pipelines for the transportation or transmission of any hazardous liquid." *Id.* § 479B.2(4). A "*hazardous liquid*," in turn, is defined as "crude oil, refined petroleum products, liquefied petroleum gases, anhydrous ammonia, liquid fertilizers, *liquefied carbon dioxide*, alcohols, and coal slurries." *Id.* § 479B.2(2) (emphasis added). We must decide whether supercritical carbon dioxide can be considered a "liquefied carbon dioxide" within the meaning of chapter 479B.

Kasischke's own expert chemical engineer testified by affidavit that "the proposed pipeline system will be largely operated in liquid phase." Summit's Chief Operating Officer, who has over twenty-five years of experience in the pipeline and energy infrastructure industry, described supercritical carbon dioxide as "pressurized above its critical point, which results in converting the [carbon dioxide] to a fluid state." He opined that supercritical carbon dioxide is a fluid and flows as a liquid would. His description is well supported. *See, e.g.,* Sarah Anne Lishman, *Deep in the Heart of Texas: How Carbon Sequestration Will Affect Valuation of the Subsurface*, 45 Saint Mary's L.J. 283, 303 (2014) (describing carbon dioxide in pipelines as being in a "supercritical liquid state"); Arnold W. Reitze Jr., *Federal Control of Carbon Capture and Storage*, 41 Env't L.

Rep. News & Analysis 10796, 10801 (2011) (describing supercritical carbon dioxide as a "supercritical fluid").

Transporting carbon dioxide in its supercritical state is the industry standard. *See* Robert R. Nordhaus & Emily Pitlick, *Carbon Dioxide Pipeline Regulation*, 30 Energy L.J. 85, 86–87 (2009) (explaining that operators typically transport carbon dioxide through pipelines in its supercritical state); Keegan Cassady, Note, *Better Late Than Never? Combating Climate Change Through Carbon Capture Utilization and Storage*, 27 Drake J. Agric. L. 273, 285 (2022) ("[M]ost carbon is transported in a supercritical liquid state . . . ."). Under federal pipeline regulations implemented under the PSA, "[c]arbon dioxide means a fluid consisting of more than 90 percent carbon dioxide molecules compressed to a supercritical state." 49 C.F.R. § 195.2.

We note that after the district court's ruling in this case, the IUB determined that supercritical carbon dioxide is a liquefied carbon dioxide, which in turn is a hazardous liquid within the meaning of chapter 479B. *See* Order Denying Motion to Dismiss, *Summit Carbon Sols., LLC*, No. HLP–2021–0001, 2023 WL 4929334, at *6 (Iowa Utils. Bd. July 28, 2023). The IUB reasoned:

> Supercritical fluid "is a material that can either be liquid or gas, used in a state above the critical temperature and critical pressure where gases and liquids coexist." Fortunati, Luzi, Puglia, & Torre, *Extraction of Lignocellulosic Materials from Waste Products* in Multifunctional Polymeric Nanocomposites Based on Cellulosic Reinforcements 22 (Elsevier 2016). *As supercritical fluids exhibit properties of both gases and liquids, Iowa Code chapter 479B governs.* Carbon dioxide in pipelines is usually compressed to above the critical point as these supercritical properties are the most favorable for both transport and sequestration. Therefore, by using the term ["]liquefied carbon dioxide," the Iowa legislature covered the most common method of transporting carbon dioxide within the definition of Iowa Code chapter 479B.

*Id.* (emphasis added). The IUB also relied in part on standards promulgated by the American Society of Mechanical Engineers (ASME).

Furthermore, ASME has determined that for its standards, which are included in PHMSA's rules, supercritical carbon dioxide shall be a liquid. ASME B31.4, B400.2 (2019). ASME's website states, "ASME is the leading international developer of codes and standards, hereafter referred to as standards, associated with the art, science, and practice of mechanical engineering. ASME is the globally recognized, trusted source of consensus standards since 1884." About ASME Standards, Am. Soc. of Mechanical Engineers, https://www.asme.org/codes-standards/about-standards (last visited July 20, 2023). PHMSA itself, through a duly enacted administrative rule, has supported the ASME definition even though its definition is for supercritical carbon dioxide. PHMSA's support for the term "liquid" is in disagreement with the narrow treatment of terminology proposed in the motion to dismiss. In the supercritical phase, there is no way to distinguish between a liquid and a gas. Considering this fact and how the industry and regulators regulate carbon dioxide, the Board concludes Summit Carbon's proposed project falls within the scope of Iowa Code chapter 479B.

*Id.*

We have deferred to the IUB's interpretation of technical terms in chapter 479B. *Puntenney*, 928 N.W.2d at 836. We reiterate that

where the General Assembly clearly delegates *discretionary* authority to an agency to interpret or elaborate a statutory term based on the agency's own special expertness, the court may not simply substitute its view as to the meaning or elaboration of the term for that of the agency but, instead, may reverse the agency interpretation or elaboration only if it is arbitrary, capricious, unreasonable, or an abuse of discretion—a deferential standard of review.

*Renda v. Iowa C.R. Comm'n*, 784 N.W.2d 8, 11 (Iowa 2010) (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 62 (1998)); *see also NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 50 (Iowa 2012) (Mansfield, J., concurring specially) ("Historically, we have deferred to the Iowa Utilities Board's interpretation of the complex and technical laws that it administers."). "Liquified carbon dioxide" is a technical term within the special expertise of the IUB. *See, e.g., Puntenney*, 928 N.W.2d at 836 (concluding that

" 'public convenience and necessity' is a term of art within the expertise of the IUB"). The term is not defined in section 479B.2. We may defer to the IUB's interpretation unless it is "irrational, illogical, or wholly unjustifiable." *Id.* (quoting *NextEra Energy Res. LLC*, 815 N.W.2d at 37 (majority opinion)). The IUB's interpretation appears to be consistent with the science, pipeline industry practices, federal law, ASME standards, and the codified purpose of the statute to protect landowners and tenants from pipeline hazards. It does not appear to be irrational, illogical, or wholly unjustifiable for the IUB to determine that supercritical carbon dioxide is a hazardous liquid within the meaning of the statute it administers.

Nevertheless, the IUB's interpretation is at issue in a contested case pending before another district court in a chapter 17A judicial review action with a broader evidentiary record developed in the IUB's pipeline approval proceedings. We are "a court of review, not of first view." *Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 413 (Iowa 2017) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)). The IUB is not a party to Kasischke's appeal and has not submitted an amicus brief here. For purposes of today's appeal, we rely on the affidavit testimony in the record before us to hold that supercritical carbon dioxide is a hazardous liquid within the meaning of Iowa Code chapter 479B.

We affirm the district court's ruling that Summit is a pipeline company with access rights under Iowa Code section 479B.15.

**C. Whether Summit Complied with the Statutory Notice Requirements.** The district court found Summit complied with section 479B.15's requirements. On our de novo review of the record, we reach the same conclusion.

The district court heard Kasischke's live testimony and found he was evasive and not credible in denying he received notice. We give weight to the

district court's credibility determination. *Parks*, 830 N.W.2d at 304. Summit documented that it sent three letters to him by restricted certified mail. We agree with the district court's finding that Kasischke received the requisite written notice. Kasischke admitted the receipt for the March 2022 letter had what appeared to be his signature. His signature is sufficient to prove receipt. Kasischke claimed he never rejected the second letter sent to him on July 14. However, the tracking information shows the letter was rejected, which constitutes receiving notice. *See, e.g., Long v. Crum*, 267 N.W.2d 407, 411 (Iowa 1978) (holding that notice was effectuated upon proof of refusal of acceptance). We find the letters themselves were sent by restricted certified mail:

> The words "*restricted certified mail*" mean any form of certified mail as defined in subsection 1 which carries on the face thereof, in a conspicuous place where it will not be obliterated, the endorsement "Deliver to addressee only" and for which the post office provides the mailer with a return receipt showing the date of delivery, the place of delivery, and person to whom delivered.

Iowa Code § 618.15(2). Summit sent these letters with the words "restricted delivery" on the envelope. The words "restricted delivery" comply with the United States Postal Service regulations to ensure delivery via restricted certified mail. USPS Domestic Mail Manual, 503 § 3.2.2 (2022).

Kasischke relies on *Buss v. Gruis*, arguing strict compliance with section 618.15 is required. *See* 320 N.W.2d 549, 552 (Iowa 1982). In *Buss*, we held that certified mail could not be used to provide notice when the statute required *restricted* certified mail. *Id.* Here, Summit provided notice using restricted certified mail.

We agree with the district court's finding that Kasischke had no tenant leasing the property at issue who required additional notice. No such tenant came forward to testify, and Kasischke provided no supporting evidence of any

lease, rent payment, or other proof. On our de novo review, we find Kasischke's testimony about a tenant not credible.

We affirm the district court's determination that Summit complied with the statutory notice requirements.

**D. Whether Section 479B.15 Authorized Issuance of This Injunction Without Proof of Irreparable Harm.** The district court granted Summit's requested injunction under Iowa Code section 479B.15, which provides, "The entry for land surveys . . . may be aided by injunction." Kasischke argues that no injunction could issue without an additional showing of "irreparable harm and substantial injury." The district court correctly rejected that argument.

We reiterate that "a statute might override the equitable requirements or impose other guidelines for courts to follow in determining whether to issue an injunction." *Worthington v. Kenkel*, 684 N.W.2d 228, 232, 234 (Iowa 2004) (holding that to obtain an injunction under Iowa Code section 70A.28(5)(*b*) against retaliatory discharge from employment, a whistleblower need not show the absence of an adequate remedy at law). "There must be some showing that the statute was designed to provide for an injunction based on the violation of some act prohibited by the statute independent of the equitable principles." *Id.* at 233. Here, that standard is satisfied. Iowa Code section 479B.15 allows an injunction when the party seeking access shows that:

- It is a pipeline company. Iowa Code § 479B.2.
- It held an information meeting in the county where access to private property is requested. *Id.* § 479B.4.
- It petitioned the IUB for a pipeline permit. *Id.* § 479B.5.
- It sent notice to the property owners and tenants (if any) by restricted certified mail. *Id.* § 479B.15.
- It provided ten days' notice before entering. *Id.*

Summit satisfied the foregoing statutory requirements for injunctive relief under section 479B.15. No additional showing of irreparable harm or substantial injury is required. We affirm the injunctive relief granted by the district court.

## IV. Disposition

For the foregoing reasons, we affirm the district court's judgment and injunctive relief.[5]

**Affirmed.**

---

[5]We note that other legal challenges to this proposed pipeline in the chapter 17A judicial review proceeding are *not* presented in this appeal, including whether the IUB validly determined this proposed pipeline serves the "public convenience and necessity," whether this pipeline company is a "common carrier" entitled to utilize eminent domain, and whether this pipeline operated by a private developer meets the constitutional requirement of a "public use" under the takings clauses in article I, section 18 of the Iowa Constitution and the Fifth Amendment to the U.S. Constitution. Those questions could be adjudicated by our court after the district court rules in the chapter 17A case, and a disappointed litigant appeals, but we cannot and do not reach those questions today.